UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> WEATHERVANE AVIATION SERVICES, LLC, ) <br> ) <br> and ) <br> ) <br> RICHARD ARAUJO, ) <br> ) <br> Defendants. ) | Civil Case No. _____ |

## COMPLAINT

1. The United States brings this Complaint against Richard Araujo ("Araujo") and his company, Weathervane Aviation Services, LLC ("Weathervane"), for operating as a commercial airline for violation of Federal Aviation Administration ("FAA") regulations. From May of 2016 through August of 2018, Weathervane operated over 1,000 flights without complying with FAA regulations. All but 52 of these flights occurred after FAA told Araujo that Weathervane's type of operation required an Air Operator Certificate and compliance with FAA safety requirements in 14 C.F.R. § 135.

2. In National Transportation Safety Board proceedings against the three pilots who flew for Weathervane, an Administrative Law Judge determined that Weathervane operated without the proper certification and that the pilots individually violated FAA regulations.

3. For Araujo's and Weathervane's violations, the United States seeks civil penalties for each and every flight operated in violation of federal law and regulations.

1

## The Parties

4. Plaintiff United States by itself and with its agencies, including the FAA, regulates the civil aviation industry.

5. Defendant Weathervane was registered as a limited liability company in the Commonwealth of Massachusetts that provided aviation management. Weathervane had a business address of 158 Sanford Road, Westport, MA 02790-3614. At all times relevant here, the registered principals of Weathervane were Richard Araujo (Manager) and Ana Gorrett Araujo (Manager).

6. Araujo is a resident of Westport, Massachusetts. Weathervane acted as the alter ego of Araujo. Araujo directed Weathervane's day-to-day operations; controlled Weathervane's finances; and exercised complete control of the company. On information and belief, Ana Gorrett Araujo was not significantly involved in the operation of Weathervane, with all aspects of the company controlled and managed by Richard Araujo.

## Jurisdiction and Venue

7. This action arises under 49 U.S.C. § 46301(a).

8. This Court has subject matter jurisdiction over this action under 49 U.S.C. §§ 46301(d)(4), 46305, and 28 U.S.C. § 1345. The amount in controversy is greater than $50,000 and is also in excess of $400,000; 49 U.S.C. § 46301(d)(4)(A)(iii) & (ii).

9. Venue is proper in the District of Massachusetts pursuant to 49 U.S.C. § 46106 and 28 U.S.C. §§ 1391(b), 1395.

10. This Court may exercise personal jurisdiction over Weathervane because the company is located in and transacted business in this District.

2

11. This Court may exercise personal jurisdiction over Richard Araujo because he can be found in, and resides in, this District and transacted business in this District.

## Regulatory Background

12. The FAA regulates many aspects of civil aviation in the United States. The Federal Aviation Regulations governing civil aviation are codified in the Code of Federal Regulations ("C.F.R.") at 14 C.F.R. §§ 1-135, *et seq.*. The following highlights some, but not all, of the Federal Aviation Regulations relevant to this Complaint.

13. Per the Federal Aviation Regulations, a commercial operator is "a person who, for compensation or hire, engages in the carriage by aircraft in air commerce of persons or property." 14 C.F.R. § 1.1. "Where it is doubtful that an operation is for 'compensation or hire,' the test applied is whether the carriage by air is merely incidental to the person's other business or is, in itself, a major enterprise for profit." *Id.*

14. "Air commerce means interstate, overseas, or foreign air commerce or the transportation of mail by aircraft or any operation or navigation of aircraft within the limits of any Federal airway or any operation or navigation of aircraft which directly affects, or which may endanger safety in, interstate, overseas, or foreign air commerce." *Id.*

15. Operational control of a flight "means the exercise of authority over initiating, conducting or terminating a flight." *Id.*

16. Part 91.1(a) "prescribes rules governing the operation of aircraft within the United States, including the waters within 3 nautical miles of the U.S. coast." Part 91.13(a) applies to aircraft operations for the purpose of air navigation and states: "[n]o person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another." 14 C.F.R. § 91.13(a).

17. Part 119 regulates how air carriers and commercial operators may operate. In pertinent part, Part 119.5(g) states: "[n]o person may operate as a direct Air Operator or as a commercial operator without, or in violation of, an appropriate certificate and appropriate operations specifications. No person may operate as a direct Air Operator or as a commercial operator in violation of any deviation or exemption authority, if issued to that person or that person's representative." 14 C.F.R. § 119.5(g).

18. Part 135 provides specific requirements for operators and applies to "[t]he commuter or on-demand operations of each person who holds or is required to hold an Air Carrier Certificate or Operating Certificate under part 119 of this chapter." 14 C.F.R. § 135.1. For instance, Part 135 requires the following:

    a. Part 135.293(a) specifies that "[n]o certificate holder may use a pilot, nor may any person serve as a pilot, unless, since the beginning of the 12th calendar month before that service, that pilot has passed a written or oral test, given by the Administrator or an authorized check pilot, on that pilot's knowledge."

    b. Part 135.293(b) specifies that "[n]o certificate holder may use a pilot, nor may any person serve as a pilot, in any aircraft unless, since the beginning of the 12th calendar month before that service, that pilot has passed a competency check given by the Administrator or an authorized check pilot in that class of aircraft, if single-engine airplane other than turbojet, or that type of aircraft, if helicopter, multiengine airplane, or turbojet airplane, to determine the pilot's competence in practical skills and techniques in that aircraft or class of aircraft."

    c. Part 135.297(a) specifies that "[n]o certificate holder may use a pilot, nor may any person serve, as a pilot in command of an aircraft under IFR unless, since the beginning

of the 6th calendar month before that service, that pilot has passed an instrument proficiency check under this section administered by the Administrator or an authorized check pilot."

    d.  Part 135.299 specifies, in part, "[n]o certificate holder may use a pilot, nor may any person serve, as a pilot in command of a flight unless, since the beginning of the 12th calendar month before that service, that pilot has passed a flight check in one of the types of aircraft which that pilot is to fly."

19. All of the Part 135 requirements set out above applied to Weathervane because it was the Air Operator and it was required under Part 119 to hold an Air Operator certificate; Araujo was responsible for ensuring Weathervane's compliance with these requirements.

## Factual Allegations

20. Defendants provided commercial flights between New Bedford, Massachusetts and Nantucket, Massachusetts for U.S. Drywall, Inc. ("U.S. Drywall") under two contracts. As discussed below, every flight under both contracts violated FAA regulations.

## The First Contract

21. On May 9, 2016, Araujo held Weathervane out as an air operator and entered into a one-year contract ("the First Contract") with U.S. Drywall, whereby Weathervane agreed to provide daily flights for U.S. Drywall employees between New Bedford Regional Airport (EWB) and Nantucket Memorial Airport (ACK).

22. Weathervane, through Araujo, provided U.S. Drywall an aircraft and pilots, acted as the point of contact between three pilots hired by Weathervane and U.S. Drywall, scheduled the flights, maintained the aircraft, paid the pilots for their services, and paid all other associated fees, including fuel, ramp, and landing fees. In exchange, U.S. Drywall paid a $25,000 monthly fee to Weathervane.

23. Under the First Contract, Weathervane operated a so-called "wet lease," (*i.e.*, any leasing arrangement whereby a person agrees to provide an entire aircraft and at least one crewmember) (14 C.F.R. § 110.2).

24. A wet lease requires a current Air Operator Certificate.

25. Weathervane began operating flights pursuant to the First Contract starting on May 9, 2016. Aircraft flight records, pilot logbooks, and invoices from Nantucket Airport indicate all three pilots listed in the lease flew N402BK with U.S. Drywall employees as passengers, on approximately 1,000 flights between May 9, 2016 through March 8, 2017, when the First Contract ended.

26. Weathervane typically made flights under the First Contract on Monday through Thursday each week, with each day involving two trips in the morning to transport up to eighteen U.S. Drywall employees to ACK and two trips in the afternoon to bring the same employees back to EWB. According to the pilots, it was typically the same group of U.S. Drywall workers on the flights.  The first flight out of EWB departed around 6:00 am  EST and returned to EWB around 4:30 pm EST that afternoon.

27. Araujo took care of all of the maintenance and operation costs for the aircraft; in accordance with the contract, Weathervane was responsible for, and handled all, maintenance, parts, ramp and landing fees, storage, and fuel for the aircraft.

28. Weathervane operated as a commercial Air Operator without the Air Operator Certificate required by the FAA and without having the pilots pass any exams or competency checks in connection with the Weathervane operations to protect the safety of their pilots and passengers.

29. In May or early June of 2016, after operating approximately 50 flights, Araujo

asked the FAA's Boston Flight Standards District Office ("FSDO") whether, hypothetically, a contract with similar terms to the one he had already entered into with U.S. Drywall would be in violation of the Federal Aviation Regulations ("FARs"). In response, by email dated June 8, 2016, the FAA's Boston FSDO notified Araujo that if Weathervane operated in that manner, "Weathervane would be acting as an Air Carrier providing Air Transportation to US Drywall without holding a[n] Air Carrier Certificate." (A copy of this email is attached as Exhibit 1).

30. Araujo understood that Weathervane was violating FAA regulations. In a text message conversation on July 22, 2016, Araujo wrote to a U.S. Drywall employee: "It's not about liability at all, it's about operational control of the aircraft. Right now we have a wet lease they would like to see a dry lease." (A copy of this text message is attached as Exhibit 2). Despite the Boston FSDO's clear-cut response that Weathervane would be in violation of the FARs by executing a "wet lease," Araujo and Weathervane operated another 600 plus flights during the First Contract, all without complying with the federal aviation regulations. Weathervane did not, at any point during the First Contract, have the requisite Air Operator Certificate. Its pilots had not taken the requisite exams for the Weathervane operation. Araujo maintained operational control over every flight.

**The Second Contract**

31. On or about March 8, 2017, Araujo and Weathervane entered into another contract with U.S. Drywall ("the Second Contract"). This time Weathervane received a payment of $24,000 per month to provide daily flights for U.S. Drywall employees between New Bedford and Nantucket. Weathervane again provided an aircraft, pilots, and paid all associated fees, including fuel, ramp and landing fees, and covered maintenance costs. The only differences between the First and Second Contracts were that: (1) the second agreement was not written down; (2)

Weathervane used a different aircraft; (3) Weathervane was paid $1,000 less per month; and (4) Araujo instructed U.S. Drywall to pay the pilots directly and to deduct the pilots' pay from Weathervane's monthly payments.

32. Araujo sought to have U.S. Drywall pay the pilots directly to make it appear to FAA that Araujo and Weathervane were not operating a wet lease in violation of the Federal Aviation Regulations. In actuality, Weathervane maintained complete operational control of the aircraft for the duration of the Second Contract, and Araujo continued to deliberately violate regulations.

33. Pursuant to the Second Contract, Weathervane operated over 100 flights for U.S. Drywall during the fall and winter of 2017. Weathervane did so without a current and appropriate Air Operator Certificate, despite knowing that it needed one.

34. Between October 17, 2017 and December 27, 2017, Weathervane operated at least 162 flights pursuant to the Second Contract using an aircraft that did not have a current and appropriate U.S. Airworthiness Certificate. The aircraft used by Weathervane under the First Contract was not available for the Second Contract so Weathervane imported an airplane from Canada (call sign/identifier N404JD); this aircraft did not have a U.S. Airworthiness Certificate. On or about January 19, 2018, Weathervane obtained a U.S. Airworthiness Certificate for the Canadian plane.

35. Between January 18, 2018 and March 19, 2018, Weathervane operated at least 97 additional flights. Although the plane used during that period had a U.S. Airworthiness Certificate, these flights violated other FAA regulations. An Air Operator Certificate is different than an Airworthiness Certificate; the former relates to the business and its compliance with applicable regulations while the latter refers to the safety and flight worthiness of the aircraft. At no point

during the operations with U.S. Drywall did Weathervane have an Air Operator Certificate.

36. The FAA's Boston FSDO informed Araujo through a letter of investigation ("LOI") dated March 19, 2018 that the FAA had reason to believe Weathervane was operating the Canadian plane (N404JD) without an Air Operator Certificate and contrary to FAA regulations. (A copy of this letter is attached as Exhibit 3.)

37. Despite this letter, between March 20, 2018, and August 31, 2018, Weathervane operated N404JD on at least another 455 flights pursuant to the Second Contract.

38. Araujo operated Weathervane in a way that disregarded FAA regulations designed to ensure the safety of its passengers and crew as well as the safety of other air operations. He maintained operational control of the aircraft despite his attempts to make it appear otherwise. And he did this all deliberately and with full knowledge that his actions were in direct violation of the FARs that maintain safety and order in commercial aviation.

### Araujo Maintained Operational Control Over the Aircraft

39. Operational control "means the exercise of authority over initiating, conducting or terminating a flight." 14 C.F.R. § 1.1.

40. Araujo initiated, conducted, or terminated all flights under the contracts between Weathervane and U.S. Drywall. Araujo obtained civil aircraft N402BK and N404JD in order to execute the wet leases. He hired the pilots that operated the daily flights between EWB and ACK. During the First Contract, he paid the pilots directly. During the Second Contract, he directed U.S. Drywall to pay the pilots, but these payments were to be, and were in fact, deducted from U.S. Drywall's payments to Weathervane. Weathervane funds were used to pay the pilots under both Contracts.  Weathervane also took care of all maintenance, fuel costs, ramp and landing fees, and other associated costs for the aircraft so that the flights could take place.

41. Araujo, by and through Weathervane, maintained operational control of aircraft N402BK and N404JD while the aircraft were used to transport U.S. Drywall employees between EWB and ACK pursuant to contracts covering May 9, 2016 through August 31, 2018.

**Araujo Knew That His Conduct Was Wrong**

42. Araujo knowingly violated the Federal Aviation Regulations designed to ensure the safety of air operations.

43. In May 2016, Araujo reached out to the Boston FSDO to inquire as to whether, hypothetically, the terms of the contract that he had signed and already started to execute with U.S. Drywall were legal without an Air Operator Certificate.

44. On June 8, 2016, in response to an inquiry from Araujo, the Boston FSDO notified Araujo that if Weathervane operated in the arrangement described by Araujo (which was how it was and how it continued to operate) Weathervane would be acting as an Air Carrier without holding an Air Carrier Certificate. (Ex. 1).

45. On July 22, 2016, Araujo admitted that he and Weathervane were operating a wet lease in a text message to U.S. Drywall. (Ex. 2).

46. Araujo continued to knowingly violate the Federal Aviation Regulations during the Second Contract. He knew that he continued to operate a wet lease with operational control without the requisite certifications. He tried to cover up these actions by directing U.S. Drywall to pay the pilots directly this time, out of funds owed to Weathervane, and by making the Second Contract a verbal agreement, rather than a written contract.

47. Furthermore, after receiving the LOI from the FSDO on March 19, 2018, Araujo continued to execute the agreement with U.S. Drywall without the requisite Air Operator Certificate through August of 2018.

48. On April 13, 2018, FAA received a letter from Araujo in which Araujo made a number of false assertions regarding his operations of Weathervane. First, he indicated that Weathervane had no operational control over any of the flights conducted for U.S. Drywall. Second, he represented that U.S. Drywall, not Weathervane, leased the aircraft used. Third, he represented that U.S. Drywall hired, paid, and controlled the pilots used. All of these representations were false, and Araujo knew them to be false. He made these false representations in an attempt to convince FAA that the lease was a so-called "dry lease" which would not require an Air Operator Certificate.

**ALJ Findings On The Wet Leases, Operational Control, and Pilot Conduct**

49. On August 27, 2019, National Transportation Safety Board proceedings against the three pilots who flew for Weathervane, Robert Kahn, Peter Kawolis, and Hahns Hitchcock ("the pilots"), commenced before Administrative Law Judge Stephen Woody. This case arose from the emergency orders of revocation of the pilots' airline transport pilot certificates and flight instructor certificates, which are required for them to fly. The FAA alleged that the pilots had served as pilot in command on dozens of flights without having passed a required test, competency check, instrument proficiency check, or annual flight check in violation of numerous FARs.

50. As part of these proceedings, the pilots stipulated that between May 9, 2016 and March 8, 2017, they had all acted as pilot in command of civil aircraft N402BK, transporting U.S. Drywall employees between New Bedford and Nantucket. The pilots also stipulated that between October 17, 2017 and December 27, 2017, they had acted as pilot in command of aircraft N404JD (*i.e.*, the Canadian plane), again transporting U.S. Drywall employees between New Bedford and Nantucket.

51. On September 11, 2019, Judge Woody issued an oral initial decision and order. He

held: "I find that the preponderance of evidence clearly establishes that the arrangement between U.S. Drywall and Weathervane Aviation, both with respect to N402BK and N404JD, constituted a wet lease arrangement." Tr. at 374. (a copy of this transcript is attached as Exhibit 4). He continued by stating: "It is also clear that Weathervane maintained operational control for both aircraft ." *Id.* at 376. He concluded that the pilots "served as pilots in command on dozens of flights operated for compensation or hire without having passed a required oral or written test, competency check, instrument proficiency check, or annual flight check" in violation of numerous FARs including 14 C.F.R. § 135.293(a) and (b). *Id.* at 378, 390. Specifically, Judge Woody also found that a "violation of careless or reckless conduct under Section 91.13(a)" was established for each pilot. *Id.* at 390.

52. Judge Woody found that revocation of the pilots' certificates "was appropriate and warranted in the public interest in air safety and commerce." *Id.* at 394. He therefore affirmed the Emergency Order of Revocation. *See id.*

**COUNT I**
**(Operating Flights Recklessly as To Endanger the Life Another)**
**(49 U.S.C. § 46301(a) and 14 C.F.R. § 91)**

53. The United States re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein. By virtue of the acts described above, Araujo and Weathervane knowingly and recklessly operated aircraft N402BK and N404JD with U.S. Drywall employees onboard the airplane without having complied with the applicable training, checking, and currency requirements of 14 CFR Part 135 endangering the life of the passengers in violation of 14 C.F.R. § 91.13(a). Each individual flight operated by Araujo and Weathervane constituted a separate violation of each of the applicable regulations.

54. By reason of the foregoing, the United States is entitled to damages in an amount not to exceed $11,000, as adjusted for inflation, for each violation of 14 C.F.R. § 91.13(a).

## COUNT II
### (Operating Without Appropriate Certification or Specifications)
### (49 U.S.C. § 46301(a) and 14 C.F.R. § 119)

55. The United States re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

56. Araujo and Weathervane violated 14 C.F.R. § 119.5(g) by knowingly operating as a direct Air Operator or as a commercial operator without an appropriate certificate and appropriate operations specifications. Each individual flight operated by Araujo and Weathervane constituted a separate violation of each of the applicable regulations.

57. By reason of the foregoing, the United States is entitled to damages in an amount not to exceed $11,000, as adjusted for inflation, for each violation of 14 C.F.R. § 119.5(g).

## COUNT III
### (Use of Unqualified Crewmembers)
### (49 U.S.C. § 46301(a) and 14 C.F.R. § 135)

58. The United States re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

59. Araujo and Weathervane used pilots in aircraft N402BK and N404JD who had not passed the appropriate written or oral tests of the pilot's knowledge in violation of 14 CFR §135.293(a).

60. Araujo and Weathervane violated 14 CFR §135.293(b) when they used pilots in aircraft N402BK and N404JD without those pilots passing the appropriate competency check to determine the pilot's competence in practical skills and techniques. Each individual flight operated by Araujo and Weathervane constituted a separate violation of each of the applicable

regulations.

61. By reason of the foregoing, the United States is entitled to damages in an amount not to exceed $11,000, as adjusted for inflation, for each violation of 14 C.F.R. § 119.5(g).

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff, the United States, requests that judgment be entered in its favor as follows:

I. On Counts I, II, and III against Weathervane Aviation Services LLC, and Richard Araujo (in his personal capacity) who are liable jointly and severally under 49 U.S.C. § 46301(a) for a civil penalty not to exceed $11,000, as adjusted for inflation, for each violation of the Federal Aviation Regulations.

II. All other and further relief as the Court may deem just and proper.

The United States hereby demands a jury trial on all claims alleged herein.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

May 26, 2023

*/s/ Thomas E. Kanwit*
Thomas E. Kanwit
Assistant United States Attorney
United States Attorney's Office
Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3272
thomas.kanwit@usdoj.gov